FILED: NEW YORK COUNTY CLERK 03/06/2015 05:40 PM     INDEX NO. 650691/2015

NYSCEF DOC. NO. 1     Case 1:15-cv-05067-PKC-RER   Document 3   Filed 07/29/15   Page 1 of 56 PageID #: 10     RECEIVED NYSCEF: 03/06/2015

SUPREME COURT: NEW YORK COUNTY

|  |  |
|---|---|
| CITIBANK, N.A.,<br><br>                        Plaintiff,<br><br>              - against - | Index No.<br><br>Plaintiff designates New York County place of trial pursuant to CPLR § 501<br><br>**SUMMONS** |

BOMBSHELL TAXI LLC, CANDY APPLE TAXI LLC, CHOPARD TAXI INC., CUPCAKE TAXI LLC, DORIT TRANSIT INC., HENNESSEY TAXI INC., ICEBERG TAXI INC., MARSEILLE TAXI LLC, MILKYWAY CAB CORP., PALERMO TAXI INC., POINTER TAXI INC., PUDDING TAXI LLC, STOLI TAXI INC., VSOP TAXI INC., BOURBON TAXI LLC, BUTTERFLY TAXI LLC, CHIANTI TAXI LLC, FRANCE TAXI LLC, HYPNOTIC TAXI LLC, MERLOT TAXI LLC, PINOT NOIR TAXI LLC, VODKA TAXI LLC, TAXI CLUB MANAGEMENT, INC., BADGER TAXI LLC, BELVEDERE TAXI LLC, COGNAC TAXI LLC, COTE DZUR TAXI, INC., CUERVO TAXI LLC, DONKEY TAXI LLC, DRAGONFLY TAXI LLC, ENAF TAXI, INC.,GOLDEN BEETLE TAXI LLC, GRASSHOPPER TAXI LLC, KOALA TAXI LLC, MACAR SERVICE CORP., MEGEVE TAXI LLC, MOTH TAXI LLC, PANDA TAXI LLC, PELICAN TAXI LLC, PRAVDA TAXI LLC, PURLIE TRANS. CORP.,SANGRIA TAXI LLC, SPLIT TRANSIT, INC., TORI AND SARAH HACKING CORP., WASP TAXI LLC, WOLVERINE TAXI, INC., EVGENY FREIDMAN and NEW YORK CITY TAXI AND LIMOUSINE COMMISSION,
                            Defendants.

To The Above-Named Defendants:

        YOU ARE HEREBY SUMMONED to answer the verified complaint in this action and to serve a copy of your answer, or if the verified complaint is not served with this

summons, to serve a notice of appearance on the plaintiff's attorneys within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the verified complaint.

Dated:   New York, New York
         March 5, 2015

                                        ZEICHNER ELLMAN & KRAUSE LLP

                                        By
                                           Nathan Schwed
                                           Tracee Davis
                                           Bruce S. Goodman
                                           Attorneys for Plaintiff
                                           1211 Avenue of the Americas
                                           New York, New York 10036
                                           (212) 223-0400


TO:      Evgeny Friedman, individually
           and on behalf of all corporate defendants
         313 Tenth Avenue
         New York, New York 10001

         The New York City Taxi and Limousine Commission
         33 Beaver Street
         New York, New York 10004

#796549

SUPREME COURT: NEW YORK COUNTY

CITIBANK, N.A.,

           Plaintiff,

    - against -

BOMBSHELL TAXI LLC, CANDY APPLE
TAXI LLC, CHOPARD TAXI INC., CUPCAKE
TAXI LLC, DORIT TRANSIT INC.,
HENNESSEY TAXI INC., ICEBERG TAXI
INC., MARSEILLE TAXI LLC, MILKYWAY
CAB CORP., PALERMO TAXI INC., POINTER
TAXI INC., PUDDING TAXI LLC, STOLI TAXI
INC., VSOP TAXI INC., BOURBON TAXI LLC,
BUTTERFLY TAXI LLC, CHIANTI TAXI LLC
FRANCE TAXI LLC, HYPNOTIC TAXI LLC
MERLOT TAXI LLC, PINOT NOIR TAXI LLC,
VODKA TAXI LLC, TAXI CLUB
MANAGEMENT, INC., BADGER TAXI LLC,
BELVEDERE TAXI LLC, COGNAC TAXI LLC,
COTE DZUR TAXI, INC., CUERVO TAXI LLC,
DONKEY TAXI LLC, DRAGONFLY TAXI
LLC, ENAF TAXI, INC., GOLDEN BEETLE
TAXI LLC, GRASSHOPPER TAXI LLC,
KOALA TAXI LLC, MACAR SERVICE CORP.,
MEGEVE TAXI LLC, MOTH TAXI LLC,
PANDA TAXI LLC, PELICAN TAXI LLC,
PRAVDA TRANS. CORP., PURLIE TRANS. CORP.,
SANGRIA TAXI LLC, SPLIT TRANSIT, INC.,
TORI AND SARAH HACKING CORP., WASP
TAXI LLC, WOLVERINE TAXI, INC.,
EVGENY FREIDMAN and NEW YORK CITY
TAXI AND LIMOUSINE COMMISSION,
           Defendants.

Index No.

**VERIFIED COMPLAINT**

Plaintiff Citibank, N.A. ("Citibank"), by its attorneys Zeichner Ellman & Krause LLP, for its complaint, alleges, upon information and belief, as follows:

## PARTIES

1.    Citibank is a national banking association organized under the laws of the United States with a main office, as set forth in its articles of association, located in South Dakota.

2.    Defendant Bombshell Taxi LLC ("Bombshell") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Bombshell is a single purpose entity that owns and licenses medallions issued by the New York City Taxi and Limousine Commission ("T&LC") bearing numbers 9J91 and 9J92.

3.    Defendant Candy Apple Taxi LLC ("Candy Apple") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Candy Apple is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 6V13 and 6V14.

4.    Defendant Chopard Taxi Inc. ("Chopard") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Chopard is a single purpose entity that

owns and licenses medallions issued by the T&LC bearing numbers 7P48, 7P49 and 7P50.

5.      Defendant Cupcake Taxi LLC ("Cupcake") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Cupcake is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 6V11 and 6V12.

6.      Defendant Dorit Transit Inc. ("Dorit") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Dorit is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU1E3333853, and owns and licenses medallions issued by the T&LC bearing numbers 9L48 and 9L49.

7.      Defendant Hennessey Taxi Inc. ("Hennessey") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Hennessey is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU8E3334451, and owns and licenses medallions issued by the T&LC bearing numbers 2V84 and 2V85.

8.      Defendant Iceberg Taxi Inc. ("Iceberg") is a New York corporation with its principal place of business located at 313 10th Avenue, New York,

New York 10001.  Upon information and belief, Iceberg is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 2L29 and 2L30.

9.    Defendant Marseille Taxi LLC ("Marseille") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Marseille is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 9V90 and 9V91.

10.    Defendant Milkyway Cab Corp. ("Milkyway") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Milkyway is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 7P37, 7P38 and 7P39.

11.    Defendant Palermo Taxi Inc. ("Palermo") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Palermo is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 4N74 and 4N75.

12.    Defendant Pointer Taxi Inc. ("Pointer") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Pointer is a single purpose entity that

owns a vehicle bearing VIN No. JTDZN3EU7E3333792, and owns and licenses medallions issued by the T&LC bearing numbers 8P16 and 8P17.

13.    Defendant Pudding Taxi LLC ("Pudding") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Pudding is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 6V25 and 6V26.

14.    Defendant Stoli Taxi Inc. ("Stoli") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Stoli is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU9E3334569, and owns and licenses medallions issued by the T&LC bearing numbers 2V44 and 2V45.

15.    Defendant Vsop Taxi Inc. ("Vsop") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Vsop is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 2V82 and 2V83.

16.    Defendant Bourbon Taxi LLC ("Bourbon") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Bourbon is a

single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 2J62 and 2J63.

17.     Defendant Butterfly Taxi LLC ("Butterfly") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Butterfly is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 9K36 and 9K37.

18.     Defendant Chianti Taxi LLC ("Chianti") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Chianti is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 2L45 and 2L46.

19.     Defendant France Taxi LLC ("France") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, France is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 9L96 and 9L97.

20.     Defendant Hypnotic Taxi LLC ("Hypnotic") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Hypnotic is a

6

single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 3P43 and 3P44.

21.     Defendant Merlot Taxi LLC ("Merlot") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Merlot is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 2P21 and 2P22.

22.     Defendant Pinot Noir Taxi LLC ("Pinot Noir") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Pinot Noir is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU2E3334669, and owns and licenses medallions issued by the T&LC bearing numbers 6G58, 6G59 and 6G60.

23.     Defendant Vodka Taxi LLC ("Vodka") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Vodka is a single purpose entity that owns and licenses medallions issued by the T&LC bearing numbers 9V40 and 9V41.

24.     Defendant Taxi Club Management, Inc. ("Taxi Club") is a New York corporation with its principal place of business located at 313 10th Avenue, New

York, New York 10001.  Upon information and belief, Taxi Club is in the business of managing taxi cab fleets.

25.     Defendant Badger Taxi LLC ("Badger") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Badger is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC0ES440408 and VIN No. 5TDZK3DC0ES441290, and owns and licenses medallions issued by the T&LC bearing numbers 1R44 and 1R45.

26.     Defendant Belvedere Taxi LLC ("Belvedere") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Belvedere is a single purpose entity that owns vehicles bearing VIN No. JTDZN3EU4E3333992 and VIN No. JTDZN3EU4E3333779, and owns and licenses medallions issued by the T&LC bearing numbers 9V42 and 9V43.

27.     Defendant Cognac Taxi LLC ("Cognac") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Cognac is a single purpose entity that owns a vehicle bearing VIN No. 5TDZK3DC2ES477363, and owns and licenses medallions issued by the T&LC bearing numbers 8V49 and 8V50.

8

28.    Defendant Cote Dzur Taxi Inc. ("Cote Dzur") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Cote Dzur is a single purpose entity that owns a vehicle bearing VIN No. 5TDZK3DC5ES477678, and owns and licenses medallions issued by the T&LC bearing numbers 8V26 and 8V27.

29.    Defendant Cuervo Taxi LLC ("Cuervo") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Cuervo is a single purpose entity that owns vehicles bearing VIN No. JTDZN3EU3E3333269 and VIN No. JTDZN3EU6E3334075, and owns and licenses medallions issued by the T&LC bearing numbers 9V32 and 9V33.

30.    Defendant Donkey Taxi LLC ("Donkey") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Donkey is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC5ES432532 and VIN No. 5TDZK3DC2ES440443, and owns and licenses medallions issued by the T&LC bearing numbers 1R42 and 1R43.

31.    Defendant Dragonfly Taxi LLC ("Dragonfly") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Dragonfly is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC1ES432673 and

9

VIN No. 5TDZK3DC1ES430700, and owns and licenses medallions issued by the T&LC bearing numbers 1R30 and 1R31.

32.    Defendant Enaf Taxi Inc. ("Enaf") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Enaf is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU2E3332789, and owns and licenses medallions issued by the T&LC bearing numbers 6H62 and 6H63.

33.    Defendant Golden Beetle Taxi LLC ("Golden Beetle") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Golden Beetle is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC4ES438323 and VIN No. 5TDZK3DC4ES413020, and owns and licenses medallions issued by the T&LC bearing numbers 1R34 and 1R35.

34.    Defendant Grasshopper Taxi LLC ("Grasshopper") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Grasshopper is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC3ES432514 and VIN No. 5TDZK3DC3ES449328, and owns and licenses medallions issued by the T&LC bearing numbers 1R32 and 1R33.

35.    Defendant Koala Taxi LLC ("Koala") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Koala is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC1ES432172 and VIN No. 5TDZK3DC9ES432226, and owns and licenses medallions issued by the T&LC bearing numbers 1R38 and 1R39.

36.    Defendant Macar Service Corp. ("Macar") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Macar is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU9E3333583, and owns and licenses medallions issued by the T&LC bearing numbers 4M40 and 4M41.

37.    Defendant Megeve Taxi LLC ("Megeve") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Megeve is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU0E3334170, and owns and licenses medallions issued by the T&LC bearing numbers 9V92 and 9V93.

38.    Defendant Moth Taxi LLC ("Moth") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Moth is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC1ES406400 and VIN No.

11

5TDZK3DC0ES424889, and owns and licenses medallions issued by the T&LC bearing numbers 1R28 and 1R29.

39.     Defendant Panda Taxi LLC ("Panda") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Panda is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC5ES422518 and VIN No. 5TDZK3DC8ES406684, and owns and licenses medallions issued by the T&LC bearing numbers 1R40 and 1R41.

40.     Defendant Pelican Taxi LLC ("Pelican") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Pelican is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC8ES441225 and VIN No. 5TDZK3DC9ES441217, and owns and licenses medallions issued by the T&LC bearing numbers 1R46 and 1R47.

41.     Defendant Pravda Taxi LLC ("Pravda") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Pravda is a single purpose entity that owns vehicles bearing VIN No. JTDZN3EU2E3333666 and VIN No. JTDZN3EU2E3333635, and owns and licenses medallions issued by the T&LC bearing numbers 9V44 and 9V45.

42.     Defendant Purlie Trans. Corp. ("Purlie") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Purlie is a single purpose entity that owns vehicles bearing VIN No. JTDZN3EU1E3334159 and VIN No. JTDZN3EU0E3334301, and owns and licenses medallions issued by the T&LC bearing numbers 9M94 and 9M95.

43.     Defendant Sangria Taxi LLC ("Sangria") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Sangria is a single purpose entity that owns a vehicle bearing VIN No. 5TDZK3DC6ES477642, and owns and licenses a medallion issued by the T&LC bearing number 8V44.

44.     Defendant Split Transit, Inc. ("Split") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Split is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EU9E3334460, and owns and licenses a medallion issued by the T&LC bearing number 5L42.

45.     Defendant Tori and Sarah Hacking Corp. ("T&S Hacking") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, T&S Hacking is a single purpose entity that owns a vehicle bearing VIN No. JTDZN3EUXE3334029, and owns and licenses a medallion issued by the T&LC bearing number 6L94.

13

46.     Defendant Wasp Taxi LLC ("Wasp") is a New York limited liability company with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Wasp is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC9ES433313 and VIN No. 5TDZK3DC1ES411869, and owns and licenses medallions issued by the T&LC bearing numbers 1R36 and 1R37.

47.     Defendant Wolverine Taxi Inc. ("Wolverine") is a New York corporation with its principal place of business located at 313 10th Avenue, New York, New York 10001.  Upon information and belief, Wolverine is a single purpose entity that owns vehicles bearing VIN No. 5TDZK3DC9ES479000 and VIN No. 5TDZK3DC2ES478500, and owns and licenses medallions issued by the T&LC bearing numbers 3R32 and 3R33.

48.     Defendant Evgeny Freidman ("Freidman") is an individual with an address of 313 10th Avenue, New York, New York 10001.  Freidman is the sole shareholder/member of each of the business entity defendants listed in paragraphs 2-47 above, and a guarantor of each of the loans described herein.

49.     Defendant T&LC is an agency of the City of New York responsible for licensing and regulating New York City's medallion taxicabs.

14

## THE $21 MILLION MEDALLION LOAN

50.     By letter dated December 20, 2012 (the "$21 Million Medallion Loan Letter"), Citibank advised defendant Freidman that it approved his request for "a $21,000,000.00 uncommitted discretionary secured facility for term loans (the "Line") to the Borrowers (as hereinafter defined) for the purchase ("Purchase") or refinance ("Refinance") of the Collateral ("Purchase/Refinance")" (the "$21 Million Medallion Loan").

51.     As set forth in the $21 Million Medallion Loan Letter, the proceeds of the $21 Million Medallion Loan were to be "used to fund term loans…for the refinance or purchase of New York City taxi medallions…"

52.     Defendants Bombshell, Candy Apple, Chopard, Cupcake, Dorit, Hennessy, Iceberg, Marseille, Milky Way, Palermo, Pointer, Pudding, Stoli and Vsop shall be referred to herein individually as a "$21 Million Medallion Loan Borrower," and collectively as the "$21 Million Medallion Loan Borrowers."

53.     To evidence loans and advances Citibank made to each of the $21 Million Medallion Loan Borrowers, each executed and delivered to Citibank promissory notes (the "$21 Million Medallion Loan Note(s)"), dated December 20, 2012, pursuant to which each $21 Million Medallion Loan Borrower promised to pay Citibank the sum identified in the $21 Million Medallion Loan Note "on December 20, 2015, or at such a earlier date as this Note shall become due and payable (the "Maturity

Date"), together with interest thereon to be computed and accrued from the date hereof, at the Applicable Interest Rate, as hereinafter defined (the "Loan")."

54. Pursuant to each $21 Million Medallion Loan Note, each $21 Million Medallion Loan Borrower was obligated to "make monthly payments on the first day of each month (commencing on February 1, 2013)" of principal and interest calculated in accordance with the terms of the $21 Million Medallion Loan Note (the "$21 Million Medallion Loan Monthly Payment").

55. To secure their obligations to Citibank, each of the $21 Million Medallion Loan Borrowers executed and delivered to Citibank identical Security Agreements, dated December 20, 2012, (the "$21 Million Medallion Loan Security Agreement(s)," and together with the $21 Million Medallion Loan Notes, and any other related documents, the "$21 Million Medallion Loan Documents"), pursuant to which each $21 Million Medallion Loan Borrower granted Citibank a security interest in "the New York City taxi medallions" owned and licensed by each $21 Million Medallion Loan Borrower and "all substitutions for, all additions to and all proceeds and products of [the New York City taxi medallions] in any form whatsoever (including, without limitation, all proceeds of insurance thereon) (the "$21 Million Medallion Loan Collateral").

56. Citibank duly perfected its security interest in the $21 Million Medallion Loan Collateral by filing UCC-1 Financing Statements with the New York Secretary of State.

**The Freidman $21 Million Medallion Loan Guaranties**

57.     On or about December 20, 2012, Freidman executed and delivered to Citibank fourteen (14) identical unconditional guaranties pursuant to which he unconditionally guaranteed payment of each of the $21 Million Medallion Loan Borrowers' obligations to Citibank under the $21 Million Medallion Loan Notes (the "$21 Million Medallion Loan Guaranties").

58.     By their terms, the $21 Million Medallion Loan Guaranties are enforceable against defendant Freidman upon a default by the $21 Medallion Loan Letter Borrowers in failing to make payment of amounts due and owing Citibank under the $21 Million Medallion Loan Notes.

## THE $10 MILLION MEDALLION LOAN

59.     By letter dated January 11, 2012 (the "$10 Million Medallion Loan Letter"), Citibank advised defendant Freidman that it approved his request for "a $10,000,000.00 uncommitted discretionary secured facility for term loans (the "Line") to the Borrowers (as hereinafter defined) for the purchase ("Purchase") or refinance ("Refinance") of the Collateral ("Purchase/Refinance")" (the "$10 Million Medallion Loan").

60.     As set forth in the $10 Million Medallion Loan Letter, the proceeds of the $10 Million Medallion Loan were to be "used to fund term loans…for the refinance or purchase of New York City taxi medallions…"

17

61.     Bourbon, Butterfly, Chianti, France, Hypnotic, Merlot, Pinot Noir, and Vodka shall be referred to herein individually as a "$10 Million Medallion Loan Borrower," and collectively as the "$10 Million Medallion Loan Borrowers."

62.     To evidence loans and advances Citibank made to each of the $10 Million Medallion Loan Borrowers, each executed and delivered to Citibank amended and restated promissory notes (the "$10 Million Medallion Loan Note(s)"), dated February 1, 2013, pursuant to which each $10 Million Medallion Loan Borrower promised to pay Citibank the sum identified on the $10 Million Medallion Loan Note "on January 31, 2015, or at such a earlier date as this Note shall become due and payable (the "Maturity Date"), together with interest thereon to be computed and accrued from the date hereof, at the Applicable Interest Rate, as hereinafter defined (the "Loan")."

63.     Pursuant to each $10 Million Medallion Loan Note, each $10 Million Medallion Loan Borrower was obligated to "make monthly payments on the first day of each month (commencing on March 1, 2013)" of principal and interest calculated in accordance with the terms of the $10 Million Medallion Loan Note (the "$10 Million Medallion Loan Monthly Payment").

64.     To secure their obligations to Citibank, each of the $10 Million Medallion Loan Borrowers executed and delivered to Citibank identical Security Agreements, dated January 31, 2012, (the "$10 Million Medallion Loan Security Agreement(s)," and together with the $10 Million Medallion Loan Notes, and any other

related documents, the "$10 Million Medallion Loan Documents"), pursuant to which each $10 Million Medallion Loan Borrower granted Citibank a security interest in "the New York City taxi medallions" owned and licensed by each $10 Million Medallion Loan Borrower and "all substitutions for, all additions to and all proceeds and products of [the New York City taxi medallions] in any form whatsoever (including, without limitation, all proceeds of insurance thereon) (the "$10 Million Medallion Loan Collateral").

65.     Citibank duly perfected its security interest in the $10 Million Medallion Loan Collateral by filing UCC-1 Financing Statements with the New York Secretary of State.

66.     The $21 Million Medallion Loan Letter and the $10 Million Medallion Loan Letter shall collectively be referred to herein as the "Medallion Loan Letters." The $21 Million Medallion Loan and the $10 Million Medallion Loan shall collectively be referred to herein as the "Medallion Loans." The $21 Million Medallion Loan Notes and the $10 Million Medallion Loan Notes shall collectively be referred to herein as the "Medallion Loan Notes." The $21 Million Medallion Loan Letter Borrowers and the $10 Million Medallion Loan Borrowers shall collectively be referred to herein as the "Medallion Loan Borrowers." The $21 Million Medallion Loan Monthly Payment and the $10 Million Medallion Loan Monthly Payment shall collectively be referred to herein as the "Medallion Loan Monthly Payments." The $21 Million Medallion Loan Security Agreements and the $10 Million Medallion Loan

19

Security Agreements shall collectively be referred to herein as the "Medallion Loan Security Agreements." The $21 Million Medallion Loan Collateral and the $10 Million Medallion Loan Collateral shall collectively be referred to herein as the "Medallion Loan Collateral." The $21 Million Medallion Loan Documents and the $10 Million Medallion Loan Documents shall collectively be referred to herein as the "Medallion Loan Documents."

### The Freidman $10 Million Medallion Loan Guaranties

67.     On or about January 31, 2012, Freidman executed and delivered to Citibank eight (8) identical unconditional guaranties pursuant to which he unconditionally guaranteed payment of each of the $10 Million Medallion Loan Borrowers' obligations to Citibank under the $10 Million Medallion Loan Notes (the "$10 Million Medallion Loan Guaranties" and, together with $21 Million Medallion Loan Guaranties, the "Medallion Loan Guaranties").

68.     By their terms, the $10 Million Medallion Loan Guaranties are enforceable against defendant Freidman upon a default by the $10 Million Medallion Loan Borrowers in failing to make payment of amounts due and owing Citibank under the $10 Million Medallion Loan Notes.

### THE $1.5 MILLION LOAN

69.     To evidence loans and advances Citibank made to Taxi Club, Taxi Club executed and delivered to Citibank a Revolving Credit Note (the "$1.5

20

Million Note"), dated July 1, 2013, pursuant to which Taxi Club promised to pay Citibank the sum of $1,500,000.00, "or, if different from such amount, the unpaid principal balance of the Revolving Advances (as hereinafter defined) as may be due and owing," on July 1, 2014, "together with interest thereon to be computed and accrued from the date hereof," in accordance with the $1.5 Million Note's terms.

70.     By agreement dated July 3, 2014, the maturity date of the $1.5 Million Note was extended to December 31, 2014 (the "$1.5 Million Loan Maturity Date").

71.     Pursuant to the terms of the $1.5 Million Note, Taxi Club was required to make a monthly payment of principal and interest on the first day of each month (the "$1.5 Million Loan Monthly Payment").

72.     To secure its obligations to Citibank, Taxi Club executed and delivered to Citibank a Security Agreement, dated July 1, 2013, (the "$1.5 Million Loan Security Agreement," and together with the $1.5 Million Note, and any other related documents, the "$1.5 Million Loan Documents"), pursuant to which Taxi Club granted Citibank a security interest in (i) all of Taxi Club's assets, (ii) all "New York City taxi medallions" pledged by the guarantors of the $1.5 Million Note [i.e., the Medallion Loan Borrowers] and (iii) "all substitutions for, all additions to and all proceeds and products of the foregoing property...in any form whatsoever (including, without limitation, all proceeds of insurance thereon)" (the "$1.5 Million Loan Collateral").

73.    Citibank duly perfected its security interest in the $1.5 Million Loan Collateral by filing a UCC-1 Financing Statement with the New York Secretary of State.

**The Freidman and Medallion Loan Borrowers $1.5 Million Note Guaranties**

74.    On or about July 1, 2013, Freidman executed and delivered to Citibank an unconditional guaranty pursuant to which he unconditionally guaranteed payment of Taxi Club's obligations to Citibank under the $1.5 Million Note (the "Freidman $1.5 Million Loan Guaranty").

75.    On or about July 1, 2013, each of the Medallion Loan Borrowers executed and delivered to Citibank an unconditional guaranty pursuant to which each of them, jointly and severally, unconditionally guaranteed payment of Taxi Club's obligations to Citibank under the $1.5 Million Note (the "Medallion Loan Borrowers $1.5 Million Loan Guaranty" and, collectively with the Freidman $1.5 Million Loan Guaranty, the "$1.5 Million Guaranties").

76.    By their terms, the $1.5 Million Loan Guaranties are enforceable against Freidman and the Medallion Loan Borrowers upon Taxi Club's default in failing to make payment of amounts due and owing Citibank under the $1.5 Million Loan Documents.

## THE VEHICLE LOANS

77.     Defendants Badger, Belvedere, Cognac, Cote Dzur, Cuervo, Donkey, Dorit, Dragonfly, Enaf, Golden Beetle, Grasshopper, Hennessey, Koala, Macar, Megeve, Moth, Panda, Pelican, Pinot Noir, Pointer, Pravda, Purlie, Sangria, Split, Stoli, T&S Hacking, Wasp, and Wolverine shall be referred to herein individually as a "Vehicle Loan Borrower," and collectively as the "Vehicle Loan Borrowers."

78.     To evidence loans and advances they received from Citibank, each Vehicle Loan Borrower executed and delivered to Citibank a Term Note – Fixed Rate (Principal and Interest) (the "Vehicle Loan Note"), dated as of the dates set forth on the schedule annexed hereto as **Exhibit A**, pursuant to which each Vehicle Loan Borrower promised to pay Citibank the sum set forth on the schedule annexed hereto as **Exhibit A** "on the maturity dates set forth on said schedule, "or at such a earlier date as this Note shall become due and payable (the "Maturity Date"), together with interest thereon to be computed and accrued from the date hereof, at the Applicable Interest Rate, as hereinafter defined (the "Loan")."

79.     Pursuant to each Vehicle Loan Note, each Vehicle Loan Borrower was obligated to make monthly payments of principal and interest calculated in accordance with the terms of the Vehicle Loan Note (the "Vehicle Loan Monthly Payment").

80.     To secure its obligations to Citibank, each Vehicle Loan Borrower executed and delivered to Citibank identical Security Agreements, dated as of the same date as the Vehicle Loan Note (the "Vehicle Loan Security Agreement(s)," and together with the Vehicle Loan Notes, and any other related documents, the "Vehicle Loan Documents"), pursuant to which each Vehicle Loan Borrower (i) granted Citibank a security interest in "the New York City taxi medallions" (the "Medallions") owned and licensed by the Vehicle Loan Borrower, (ii) agreed to grant Citibank a security interest in the vehicles owned by the Vehicle Loan Borrower (the "Vehicles"), and (iii) agreed to execute any and documents necessary in order to grant a valid and enforceable lien against the Vehicles (the "Vehicle Loan Collateral")

81.     Citibank duly perfected its security interest in the Medallions listed on the schedule annexed hereto as **Exhibit A** by filing UCC-1 Financing Statements with the New York Secretary of State.

82.     Based upon information provided by management/employees of the Vehicle Loan Borrowers, Citibank was able to perfect its security interest against certain of the Vehicles, as reflected on the schedule annexed hereto as **Exhibit A**, by filing an MV-900 Notice of Lien with the New York State Department of Motor Vehicles.

83.     For certain Vehicles listed on **Exhibit A** Citibank was unable to perfect its security interest because management/employees of the Vehicle Loan Borrowers failed and/or refused to provide Citibank with the necessary documents

24

and/or information, including correct title documents, to enable Citibank to file the required form.

84.     The Vehicle Loan Borrowers' failure/refusal to provide the necessary documents and/or information constitutes a default under the Vehicle Loan Documents.

**The Freidman Vehicle Loan Guaranties**

85.     On the date that each Vehicle Loan Note was executed, Freidman executed and delivered to Citibank identical unconditional guaranties pursuant to which he unconditionally guaranteed payment of the Vehicle Loan Borrowers' obligations to Citibank under each Vehicle Loan Note (the "Vehicle Loan Guaranties").

86.     By their terms, the Vehicle Loan Guaranties are enforceable against defendant Freidman upon a default by the Vehicle Loan Borrowers in failing to make payment of the amounts due and owing Citibank under the Vehicle Loan Notes.

## THE $1.5 MILLION NOTE DEFAULTS

87.     Pursuant to Section 6(a) of the $1.5 Million Loan Security Agreement, "the occurrence of any of the following events shall constitute an 'Event of Default' under this Agreement: (a) if the Borrower shall not pay when due: (i) any installment of principal or interest under the Note; or (ii) any other payments due under the Note prior to the Maturity Date."

88.     Pursuant to Section 6 of the $1.5 Million Note, "at the option of the holder of this Note and upon the terms and conditions provided in the Security Agreement, upon (a) a default in making any payment of principal and/or interest hereunder when due and payable, and such default continuing beyond the applicable grace period, if any, or (b) the occurrence of an Event of Default (as such term is defined in the Security Agreement), the unpaid principal balance hereof, all accrued interest and all unpaid fees, charges and expenses shall become immediately due and payable."

89.     Pursuant to the terms of the $1.5 Million Note, Taxi Club was obligated to make a $1.5 Million Loan Monthly Payment on December 1, 2014.

90.     Taxi Club failed to make the required $1.5 Million Loan Monthly Payment on December 1, 2014.

91.     Taxi Club's failure to make the required $1.5 Million Loan Monthly Payment on December 1, 2014, constituted an Event of Default pursuant to the terms of the $1.5 Million Dollar Loan Documents entitling Citibank to accelerate the $1.5 Million Note.

92.     Notwithstanding the default by Taxi Club in failing to make the $1.5 Million Loan Monthly Payment on December 1, 2014, Citibank did not immediately declare a default.

93.     However, on December 4, 2014, when Citibank had still not received the $1.5 Million Loan Monthly Payment from Taxi Club, it elected to declare a default and accelerate the $1.5 Million Note.

94.     By letter dated December 4, 2014 (the "$1.5 Million Loan Default and Acceleration Letter"), Citibank (i) gave notice of the default to Taxi Club, and to Freidman and the Medallion Loan Borrowers, in their capacities as guarantors of Taxi Club's obligations under the $1.5 Million Note (collectively, the "$1.5 Million Loan Guarantors") (ii) declared the outstanding balance due under the $1.5 Million Note to be immediately due and payable (the "$1.5 Million Loan Acceleration"), and (iii) demanded Taxi Club and the $1.5 Million Loan Guarantors immediately pay in full the outstanding aggregate principal sum of $1,487,835.12 due under the $1.5 Million Note, together with accrued but unpaid interest from October 23, 2014 through the date of the $1.5 Million Loan Default and Acceleration Letter at the contract rate set forth in the $1.5 Million Note, and thereafter at the default rate as set forth in the $1.5 Million Loan Documents, together with fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the $1.5 Million Loan Documents, including without limitation attorneys' fees and expenses (the "$1.5 Million Loan Indebtedness").

95.     As a result of the $1.5 Million Loan Acceleration, the full amount of the $1.5 Million Loan Indebtedness became immediately due and payable.

96. On December 10, 2014, Citibank received a payment in an amount equal to the $1.5 Million Loan Monthly Payment due on December 1, 2014 (the "12/10/14 Payment").

97. In addition to the $1.5 Million Loan Acceleration, the $1.5 Million Note otherwise matured on its own terms on the $1.5 Million Loan Maturity Date of December 31, 2014 (the "$1.5 Million Loan Maturity").

98. Taxi Club failed to pay the previously accelerated $1.5 Million Loan Indebtedness notwithstanding the $1.5 Million Loan Maturity.

99. Similarly, the $1.5 Million Loan Guarantors failed to pay the $1.5 Million Loan Indebtedness notwithstanding the $1.5 Million Loan Maturity.

100. Instead, on December 31, 2014, Citibank received a payment in the amount of $4,250 to be applied to Taxi Club's obligation under the $1.5 Million Note (the "12/31/14 Payment").

101. On January 2, 2015, Citibank received an additional payment in the amount of $1,000 (the "1/2/15 Payment").

102. On January 13, 2015, Citibank received an additional payment in the amount of $6,000 (the "1/13/15 Payment").

103. The 12/10/14 Payment, the 12/31/14 Payment, the 1/2/15 Payment, and the 1/13/15 Payment were applied to the $1.5 Million Note and

constituted partial payments of the $1.5 Million Loan Indebtedness (the "Partial $1.5 Million Loan Indebtedness Payments").

104.    After applying the Partial $1.5 Million Loan Indebtedness Payments, there remains due and owing on the $1.5 Million Loan Indebtedness, as of February 3, 2015, the principal amount of $1,489,738.27, together with accrued interest at the contract rate through December 4, 2014, interest at the default rate from December 5, 2014 until the date of payment of the $1.5 Million Loan Indebtedness, plus fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the $1.5 Million Loan Documents, including without limitation attorneys' fees and expenses (the "Outstanding $1.5 Million Loan Debt").

## MEDALLION LOAN DEFAULTS

### The Initial Default and Acceleration

105.    Paragraph 1 of each Medallion Loan Security Agreement defines the term "Indebtedness" to include "any other indebtedness or liability of the [Medallion Loan Borrowers] to the Lender, direct or indirect, absolute or contingent due or to become due, now existing or hereafter arising, including all future advances or loans that may be made at the reasonable option of the Lender."

106.    Paragraph 6(a) of each Medallion Loan Security Agreement provides that "the occurrence of any of the following events shall constitute an 'Event of Default' under this Agreement: (a) if the Borrower shall not pay when due: (i) any

installment of principal or interest under the Note; or (ii) any other payments due under the Note prior to the Maturity Date.; (b) if the Borrower shall not pay when due, any other part of the Indebtedness or any other amount payable in connection with the Indebtedness or any part thereof;…"

107. Section 6 of each Medallion Loan Note provides that "at the option of the holder of this Note and upon the terms and conditions provided in the Security Agreement, upon (a) a default in making any payment of principal and/or interest hereunder when due and payable, and such default continuing beyond the applicable grace period, if any, or (b) the occurrence of an Event of Default (as such term is defined in the Security Agreement), the unpaid principal balance hereof, all accrued interest and all unpaid fees, charges and expenses shall become immediately due and payable."

108. Section 9(b) of each Medallion Loan Letter provides that "[t]he occurrence of a default under any Loan or any other agreement between any Borrower and the Bank shall constitute a default under all of the Loans entitling the Bank to its remedies under each of the [Medallion Loan] Documents, including without limitation, acceleration of all of the Loans, it being understood and agreed that all Loans under the [Medallion Loan Letter] are to be cross-defaulted and cross-accelerated. Collateral of any Borrower shall be cross-collateralized such that they secure the Loans of that Borrower."

109.    Pursuant to the terms of the Medallion Loan Notes, each of the Medallion Loan Borrowers was obligated to make a Medallion Loan Monthly Payment on December 1, 2014.

110.    Each of the Medallion Loan Borrowers failed to make the required Medallion Loan Monthly Payment on December 1, 2014.

111.    The failure by each of the Medallion Loan Borrowers to make the required Medallion Loan Monthly Payment on December 1, 2014, constituted an Event of Default pursuant to the terms of the Medallion Loan Documents entitling Citibank to accelerate the Medallion Loan Notes.

112.    Notwithstanding the default by each of the Medallion Loan Borrowers in failing to make the Medallion Loan Monthly Payment due on December 1, 2014, Citibank did not immediately declare a default.

113.    However, on December 4, 2014, when Citibank had still not received the Medallion Loan Monthly Payment from each of the Medallion Loan Borrowers, it elected to declare a default and accelerate the Medallion Loan Notes (the "Medallion Loan Acceleration").

114.    By letters dated December 4, 2014 (the "Medallion Loan Default and Acceleration Letters"), Citibank (i) gave notice of the default to each of the Medallion Loan Borrowers and to Freidman in his capacity as guarantor, (ii) declared the outstanding balances due under each of the Medallion Loan Notes to be

immediately due and payable, and (iii) demanded the immediate payment in full of the outstanding principal amounts due under the Medallion Loan Notes, together with accrued but unpaid interest from November 1, 2014 through the date of the Medallion Loan Default and Acceleration Letters at the contract rate set forth in the Medallion Loan Notes, and thereafter at the default rate as set forth in each respective note, together with fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the Medallion Loan Documents, including without limitation attorneys' fees and expenses (collectively, the "Medallion Loan Indebtedness").

115.    As a result of the Medallion Loan Acceleration, the full amount of the Medallion Loan Indebtedness became immediately due and payment.

116.    On December 5, 2014, Citibank received multiple checks (the "12/5/14 Medallion Loan Checks"), in amounts equal to the amounts of the Medallion Loan Monthly Payments due on December 1, 2014 for each of the Medallion Loan Notes.

117.    The 12/5/14 Medallion Loan Checks contained designations as to which Medallion Loan Note each payment was to be applied.

118.    However, the bank accounts on which the 12/5/14 Medallion Loan Checks were drawn did not have sufficient funds to pay the 12/5/14 Medallion

Loan Checks on December 5, 2014; in fact, they had no funds in them and were in a negative balance.

119.   On December 9, 2014, when the 12/5/14 Medallion Loan Checks were processed by Citibank, the drawing accounts were still without funds.

120.   A portion of the 12/5/14 Medallion Loan Checks were funded on December 10, 2014, while a total of $81,994.00 was not funded until December 11, 2014.

121.   On December 31, 2014, Citibank received multiple checks (the "12/31/14 Medallion Loan Checks"), in the aggregate sum of $204,302.00.

122.   The 12/31/14 Medallion Loan Checks contained designations as to which of the Medallion Loan Notes each payment was to be applied to.

123.   The payments received by Citibank via the 12/5/14 Medallion Loan Checks and the 12/31/14 Medallion Loan Checks constituted partial payments of the accelerated Medallion Loan Indebtedness (the "Partial Medallion Loan Indebtedness Payments").

**Additional Default and Acceleration of Medallion Loans**

124.   Taxi Club's failure to pay the $1.5 Million Loan Indebtedness by the $1.5 Million Loan Maturity Date of December 31, 2014 constituted a default by each of the Medallion Loan Borrowers and Freidman under the $1.5 Million Guaranties,

which triggered an additional default by each of the Medallion Loan Borrowers and by Freidman, in his capacity as guarantor, under the Medallion Loan Documents (the "Additional Medallion Loan Default") and gave Citibank an additional right to accelerate each of the Medallion Loan Notes.

125.    By letters dated January 22, 2015 (the "Additional Medallion Loan Default and Acceleration Letters"), Citibank (i) gave notice of the Additional Medallion Loan Default to each of the Medallion Loan Borrowers and to Freidman, (ii) once again declared the Medallion Loan Indebtedness to be immediately due and payable, and (iii) demanded the immediate payment of the Medallion Loan Indebtedness.

126.    The Medallion Loan Borrowers and Freidman have failed to pay the full amount of Medallion Loan Indebtedness.

127.    Instead, on January 30, 2015, Citibank received multiple checks (the "1/30/15 Medallion Loan Checks"), in the aggregate sum of $159,802.

128.    The 1/30/15 Medallion Loan Checks contained designations as to which of the Medallion Loan Notes each payment was to be applied to.

129.    The payments received by Citibank toward the Medallion Loan Indebtedness via the 1/30/15 Medallion Loan Checks constituted Partial Medallion Loan Indebtedness Payments.

34

130.   After application of the Partial Medallion Loan Indebtedness Payments, each of the $21 Million Medallion Loan Borrowers is currently indebted to Citibank under the $21 Million Medallion Loan Notes in the principal sum identified on **Exhibit B** annexed hereto, together with accrued interest at the contract rate through December 4, 2014, interest at the default rate from December 5, 2014 until the date of payment of the full amount of the $21 Million Medallion Loan Indebtedness, plus fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the $21 Million Medallion Loan Documents, including without limitation attorneys' fees and expenses (the "Outstanding $21 Million Medallion Loan Debt").

131.   After application of the Partial Medallion Loan Indebtedness Payments, each of the $10 Million Medallion Loan Borrowers is currently indebted to Citibank under the $10 Million Medallion Loan Notes in the principal sum identified on **Exhibit C** annexed hereto, together with accrued interest at the contract rate through December 4, 2014, interest at the default rate from December 5, 2014 until the date of payment of the full amount of the $10 Million Medallion Loan Indebtedness, plus fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the $10 Million Medallion Loan Documents, including without limitation attorneys' fees and expenses (the "Outstanding $10 Million Medallion Loan Debt" and, together with the Outstanding $21 Million Medallion Loan Debt, the "Outstanding Medallion Loan Debt").

**Maturity of the $10 Million Medallion Loan**

132.   In addition to the Medallion Loan Acceleration on December 4, 2014, and the Additional Medallion Loan Acceleration on January 22, 2015, the $10 Million Medallion Loan otherwise matured on its own terms on January 31, 2015 (the "$10 Million Medallion Loan Maturity").

133.   The $10 Million Dollar Medallion Loan Borrowers and Freidman have failed to pay the Outstanding $10 Million Medallion Loan Debt.  This constitutes an additional default under the $10 Million Loan Documents.

## DEFAULT AND ACCELERATION
## OF THE VEHICLE LOAN NOTES

134.   Section 10(c) of each Vehicle Loan Security Agreement provides that it "shall constitute an event of default by Debtor under this Security Agreement: … (c) if Debtor or any obligor, *guarantor* of or any party to any of the Obligations or the Collateral (the same, including Debtor, being collectively referred to herein as "Obligors") shall default in the punctual payment of any sum payable with respect to, or in the observance or performance of any of the terms and conditions of, any Obligations of this Security Agreement or *any other agreement between any Obligor and Citibank.*"

135.   Notwithstanding the Medallion Loan Acceleration, the Additional Medallion Loan Acceleration and the $10 Million Loan Maturity, Freidman failed to pay the Outstanding Medallion Loan Debt and it remains due and owing.

36

136.    Notwithstanding the $1.5 Million Loan Acceleration and the $1.5 Million Loan Maturity, Freidman failed to pay the Outstanding $1.5 Million Loan Debt and it remains due and owing.

137.    Pursuant to Section 10(c) of each Vehicle Loan Security Agreement, Freidman's defaults under the Freidman Medallion Loan Guaranties and the Freidman $1.5 Million Loan Guaranty constitute events of default under the Vehicle Loan Security Agreement.

138.    By letter dated January 22, 2015 (the "Vehicle Loan Default and Acceleration Letter"), Citibank (i) gave notice of the default to each of the Vehicle Loan Borrowers and to Freidman in his capacity as guarantor, (ii) declared the outstanding balances due under each of the Vehicle Loan Notes to be immediately due and payable, and (iii) demanded the immediate payment in full of the outstanding principal amounts due under the Vehicle Loan Notes, together with accrued but unpaid interest through the date of the Vehicle Loan Default and Acceleration Letters at the contract rate set forth in the Vehicle Loan Notes, and thereafter at the default rate as set forth in each respective note, together with fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the Vehicle Loan Documents, including without limitation attorneys' fees and expenses (collectively, the "Vehicle Loan Indebtedness").

139.    The Vehicle Loan Borrowers and Freidman failed to pay the full amount of Vehicle Loan Indebtedness.

140.   Instead, on January 30, 2015, Citibank received multiple checks (the "1/30/15 Vehicle Loan Checks"), in the aggregate sum of $40,280.00.

141.   The 1/30/15 Vehicle Loan Checks contained designations as to which of the Vehicle Loan Notes each payment was to be applied to.

142.   The payments received by Citibank toward the Vehicle Loan Indebtedness via the 1/30/15 Vehicle Loan Checks constituted partial payments of the Vehicle Loan Indebtedness (the "Partial Vehicle Loan Indebtedness Payments").

143.   After application of the Partial Vehicle Loan Indebtedness Payments, each of the Vehicle Loan Borrowers is currently indebted to Citibank under the Vehicle Loan Notes in the principal sum identified on **Exhibit A** annexed hereto, together with accrued interest at the contract rate through January 22, 2015, interest at the default rate from January 23, 2015 until the date of payment of the full amount of the Vehicle Loan Indebtedness, plus fees, NSF fees and related charges, and all costs and expenses for collection of the amounts due under the Vehicle Loan Documents, including without limitation attorneys' fees and expenses (the "Outstanding Vehicle Loan Debt").

## CITIBANK'S ENTITLEMENT TO IMMEDIATE
## POSSESSION OF THE MEDALLION LOAN COLLATERAL

144.    Pursuant to Section 7 of each Medallion Loan Security Agreement, "[i]n the event that [Citibank] elects to accelerate the [Medallion Loan Indebtedness]…and within ten (10) days after the mailing of such notice the Borrower fails to pay the [Medallion Loan Indebtedness]…then in any such events [Citibank] shall have the right, in addition to and in connection with any other rights it may have under the Note, the Agreement, the Medallion Loan Letter, the Uniform Commercial Code and otherwise at law or in equity…(b) to enter upon the Borrower's premises or with legal process and take possession of the [Medallion Loan Collateral], and the Borrower agrees not to resist or interfere…and, (d) to sell, assign and deliver the [Medallion Loan Collateral] at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale…"

145.    As a result of the default by each of the Medallion Loan Borrowers and the Medallion Loan Acceleration, Citibank is entitled to immediate possession of the Medallion Loan Collateral.

## CITIBANK'S ENTITLEMENT TO IMMEDIATE POSSESSION
## OF THE $1.5 MILLION LOAN COLLATERAL

146.     Pursuant to Section 7 of the $1.5 Million Loan Security Agreement, "[i]n the event that [Citibank] elects to accelerate the [$1.5 Million Loan Indebtedness]…and within ten (10) days after the mailing of such notice the Borrower fails to pay the [$1.5 Million Loan Indebtedness]…then in any such events [Citibank] shall have the right, in addition to and in connection with any other rights it may have under the Note, the Agreement, the Uniform Commercial Code and otherwise at law or in equity...(b) to enter upon the Borrower's premises or with legal process and take possession of the [$1.5 Million Loan Collateral], and the Borrower agrees not to resist or interfere…and, (d) to sell, assign and deliver the [$1.5 Million Loan Collateral] at public or private sale, for cash, on credit or future delivery, with or without advertisement of the time, place or terms of sale…"

147.     As a result of Taxi Club's default, Citibank is entitled to immediate possession of the $1.5 Million Loan Collateral.

## CITIBANK'S ENTITLEMENT TO IMMEDIATE
## <u>POSSESSION OF THE VEHICLE LOAN COLLATERAL</u>

148.    Pursuant to Section 11(a) of each Vehicle Loan Security Agreement, "[i]n the event of the occurrence and continuance of any Event of Default, [Citibank] shall at any time thereafter have the right, with or without (to the extent permitted by applicable law) notice to [Vehicle Loan Borrower], as to any or all of the [Vehicle Loan] Collateral, by available judicial procedures or without judicial procedures, to take possession of the [Vehicle Loan] Collateral and without liability for trespass to enter any premises where the [Vehicle Loan] Collateral may be located for the purpose of taking possession of or removing the [Vehicle Loan] Collateral, and generally to exercise any and all rights afforded to a secured party under the UCC or other applicable law...[Vehicle Loan Borrower] agreed that [Citibank] shall have the right to sell, lease, license, or otherwise dispose of all or any part of the [Vehicle Loan] Collateral...at [Citibank's] request, [Vehicle Loan Borrower] shall assemble the [Vehicle Loan] Collateral and make it available to [Citibank] at places which [Citibank] shall select..."

149.    As a result of the default by each of the Vehicle Loan Borrowers and the Vehicle Loan Acceleration, Citibank is entitled to immediate possession of the Vehicle Loan Collateral.

## FIRST CAUSE OF ACTION
### (Replevin - $21 Million Medallion Loan Collateral)

150.    Citibank repeats and realleges the allegations contained in paragraphs 1 through 149.

151.    Pursuant to the $21 Million Medallion Loan Security Agreements, upon default by the $21 Million Medallion Loan Borrowers, Citibank is entitled to take immediate possession of the $21 Million Medallion Loan Collateral, without further demand or further notice, and without legal process, and the $21 Million Medallion Loan Borrowers are required to assemble the $21 Million Medallion Loan Collateral and make it available to Citibank at a reasonable place designated by Citibank, and Citibank is authorized to take possession of and remove the $21 Million Medallion Loan Collateral, and to sell, assign and deliver the $21 Million Medallion Loan Collateral at public or private sale in accordance with applicable law.

152.    As a result of the $21 Million Medallion Loan Borrowers' default, their continued possession of the $21 Million Medallion Loan Collateral is wrongful.

153.    Citibank is entitled to immediate possession of the $21 Million Medallion Loan Collateral.

## SECOND CAUSE OF ACTION
### (Replevin - $10 Million Medallion Loan Collateral)

154.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 153.

155.   Pursuant to the $10 Million Medallion Loan Security Agreements, upon default by the $10 Million Medallion Loan Borrowers, Citibank is entitled to take immediate possession of the $10 Million Medallion Loan Collateral, without further demand or further notice, and without legal process, and the $10 Million Medallion Loan Borrowers are required to assemble the $10 Million Medallion Loan Collateral and make it available to Citibank at a reasonable place designated by Citibank, and Citibank is authorized to take possession of and remove the $10 Million Medallion Loan Collateral, and to sell, assign and deliver the $10 Million Medallion Loan Collateral at public or private sale in accordance with applicable law.

156.   As a result of the $10 Million Medallion Loan Borrowers' default, their continued possession of the $10 Million Medallion Loan Collateral is wrongful.

157.   Citibank is entitled to immediate possession of the $10 Million Medallion Loan Collateral.

43

## THIRD CAUSE OF ACTION
### (Replevin - $1.5 Million Loan Collateral)

158.    Citibank repeats and realleges the allegations contained in paragraphs 1 through 157.

159.    Pursuant to the $1.5 Million Loan Security Agreement, upon default by Taxi Club, Citibank is entitled to take immediate possession of the $1.5 Million Loan Collateral, without further demand or further notice, and without legal process, and Taxi Club is required to assemble the $1.5 Million Loan Collateral and make it available to Citibank at a reasonable place designated by Citibank, and Citibank is authorized to take possession of and remove the $1.5 Million Loan Collateral, and to sell, assign and deliver the $1.5 Million Loan Collateral at public or private sale in accordance with applicable law.

160.    As a result of Taxi Club's default, its continued possession of the $1.5 Million Loan Collateral is wrongful.

161.    Citibank is entitled to immediate possession of the $1.5 Million Loan Collateral.

## FOURTH CAUSE OF ACTION
### (Replevin – Vehicle Loan Collateral)

162.    Citibank repeats and realleges the allegations contained in paragraphs 1 through 161.

163.   Pursuant to the Vehicle Loan Security Agreements, upon default by the Vehicle Loan Borrowers, Citibank is entitled to take immediate possession of the Vehicle Loan Collateral, without further demand or further notice, and without legal process, and the Vehicle Loan Borrowers are required to assemble the Vehicle Loan Collateral and make it available to Citibank at a reasonable place designated by Citibank, and Citibank is authorized to take possession of and remove the Vehicle Loan Collateral, and to sell, assign and deliver the Vehicle Loan Collateral at public or private sale in accordance with applicable law.

164.   As a result of the Vehicle Loan Borrowers' default, their continued possession of the Vehicle Loan Collateral is wrongful.

165.   Citibank is entitled to immediate possession of the Vehicle Loan Collateral.

### FIFTH CAUSE OF ACTION
### (TRO, Preliminary and Permanent Injunction)

166.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 165.

167.   Citibank is likely to suffer irreparable harm should the Medallion Loan Borrowers, the Vehicle Loan Borrowers, the $1.5 Million Loan Borrowers, Freidman, or the T&LC transfer, dispose of or otherwise interfere with the Medallion Loan Collateral, the Vehicle Loan Collateral, or the $1.5 Million Loan Collateral.

168.    Citibank is likely to prevail on the merits of its cause of action for replevin of the Medallion Loan Collateral, the Vehicle Loan Collateral, and the $1.5 Million Loan Collateral.

169.    Accordingly, Citibank is entitled to temporary, preliminary, and permanent injunctive relief enjoining the Medallion Loan Borrowers, the Vehicle Loan Borrowers, the $1.5 Million Loan Borrowers, Freidman, and the T&LC from taking possession of, or otherwise exercising continued control over, the Medallion Loan Collateral, the Vehicle Loan Collateral and the $1.5 Million Loan Collateral, removing the Medallion Loan Collateral, Vehicle Loan Collateral, and the $1.5 Million Loan Collateral from the Medallion Loan Borrowers', Vehicle Loan Borrowers', and the $1.5 Million Loan Borrowers' business, or any other location, transferring, selling, pledging, or assigning the Medallion Loan Collateral, the Vehicle Loan Collateral and the $1.5 Million Loan Collateral, changing the composition of the Medallion Loan Collateral, Vehicle Loan Collateral and the $1.5 Million Loan Collateral, or otherwise disposing of the Medallion Loan Collateral, the Vehicle Loan Collateral, and the $1.5 Million Loan Collateral.

### SIXTH CAUSE OF ACTION
### ($21 Million Medallion Loan Indebtedness)

170.    Citibank repeats and realleges the allegations contained in paragraphs 1 through 169.

171.   By virtue of the foregoing, Citibank is entitled to judgment against the $21 Million Medallion Loan Borrowers in the amount of the Outstanding $21 Million Medallion Loan Debt.

### SEVENTH CAUSE OF ACTION
### ($10 Million Medallion Loan Indebtedness)

172.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 171.

173.   By virtue of the foregoing, Citibank is entitled to judgment against the $10 Million Medallion Loan Borrowers in the amount of the Outstanding $10 Million Medallion Loan Debt.

### EIGHTH CAUSE OF ACTION
### ($1.5 Million Loan Indebtedness)

174.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 173.

175.   By virtue of the foregoing, Citibank is entitled to judgment against Taxi Club in the amount of the Outstanding $1.5 Million Loan Debt.

### NINTH CAUSE OF ACTION
### (Vehicle Loan Indebtedness)

176.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 175.

177.   By virtue of the foregoing, Citibank is entitled to judgment against the Vehicle Loan Borrowers in the amount of the Outstanding Vehicle Loan Debt.

### TENTH CAUSE OF ACTION
**(Freidman Guaranties)**

178.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 177.

179.   Freidman failed to pay the Outstanding $21 Million Medallion Loan Debt as required pursuant to the $21 Million Medallion Loan Guaranties.

180.   Freidman failed to pay the Outstanding $10 Million Medallion Loan Debt as required pursuant to the $10 Million Medallion Loan Guaranties.

181.   Freidman failed to pay the Outstanding $1.5 Million Loan Debt as required pursuant to the Freidman $1.5 Million Loan Guaranty.

182.   Freidman failed to pay the Outstanding Vehicle Loan Debt as required pursuant to the Freidman Vehicle Loan Guaranty.

183.   By virtue of the foregoing, Citibank is entitled to judgment against Freidman for the full amount of (i) the Outstanding $21 Million Medallion Loan Debt, (ii) the Outstanding $10 Million Medallion Loan Debt, (iii) the Outstanding $1.5 Million Loan Debt and (iv) the Outstanding Vehicle Loan Debt.

## ELEVENTH CAUSE OF ACTION
### (Medallion Loan Borrowers $1.5 Million Loan Guaranties)

184.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 183.

185.   The Medallion Loan Borrowers failed to pay the Outstanding $1.5 Million Loan Debt as required pursuant to the Medallion Loan Borrowers $1.5 Million Loan Guaranties.

186.   By virtue of the foregoing, Citibank is entitled to judgment against the Medallion Loan Borrowers for the full amount of the Outstanding $1.5 Million Loan Debt.

## TWELFTH CAUSE OF ACTION
### (Attorneys' Fees, Costs and Disbursements)

187.   Citibank repeats and realleges the allegations contained in paragraphs 1 through 186.

188.   Pursuant to the Medallion Loan Documents, the Medallion Loan Borrowers and Freidman agreed to pay all of Citibank's fees, expenses and disbursements, including attorneys' fees, incurred to enforce and protect Citibank's rights under the Medallion Loan Documents.

189.   Pursuant to the $1.5 Million Loan Documents, Taxi Club, the Medallion Loan Borrowers and Freidman agreed to pay all of Citibank's fees, expenses

and disbursements, including attorneys' fees, incurred to enforce and protect Citibank's rights under the $1.5 Million Loan Documents.

190.   Pursuant to the Vehicle Loan Documents, the Vehicle Loan Borrowers and Freidman agreed to pay all of Citibank's fees, expenses and disbursements, including attorneys' fees, incurred to enforce and protect Citibank's rights under the Vehicle Loan Documents.

191.   By virtue of the foregoing, Citibank is entitled to judgment against the Medallion Loan Borrowers, the Vehicle Loan Borrowers, Taxi Club and Freidman for its costs, fees and disbursements, including reasonable attorneys' fees and expenses in an amount to be determined, incurred to enforce and protect Citibank's rights under the Medallion Loan Documents, the $1.5 Million Loan Documents and the Vehicle Loan Documents.

**WHEREFORE**, Citibank demands judgment against defendants as follows:

(i)   on the first cause of action, against the $21 Million Medallion Loan Borrowers for immediate possession of the $21 Million Medallion Loan Collateral and directing the $21 Million Medallion Loan Borrowers to deliver the $21 Million Medallion Loan Collateral to Citibank;

(ii)    on the second cause of action, against the $10 Million Medallion Loan Borrowers for immediate possession of the $10 Million Medallion Loan Collateral and directing the $10 Million Medallion Loan Borrowers to deliver the $10 Million Medallion Loan Collateral to Citibank;

(iii)    on the third cause of action, against Taxi Club for immediate possession of the $1.5 Million Loan Collateral and directing Taxi Club to deliver the $1.5 Loan Note Collateral to Citibank;

(iv)    on the fourth cause of action, against the Vehicle Loan Borrowers for immediate possession of the Vehicle Loan Collateral and directing the Vehicle Loan Borrowers to deliver the Vehicle Loan Collateral to Citibank

(v)    on the fifth cause of action, against the Medallion Loan Borrowers, the Vehicle Loan Borrowers, the $1.5 Million Loan Borrowers, Freidman, and the New York City Taxi and Limousine Commission for temporary, preliminary and permanent injunctive relief enjoining them from taking possession of, or otherwise exercising any control over, the $21 Million Medallion Loan Collateral, the $10 Million Medallion Loan Collateral, the Vehicle Loan Collateral and/or the $1.5 Million Loan Collateral, or removing said collateral from their

51

places of business, or any other location, or transferring, selling, pledging, or assigning said collateral, changing the composition of said collateral, or otherwise disposing of said collateral;

(vi)    on the sixth cause of action, against the $21 Million Medallion Loan Borrowers, jointly and severally, in the amount of $19,906,909.97, plus interest and default interest;

(vii)    on the seventh cause of action, against the $10 Million Medallion Loan Borrowers, jointly and severally, in the amount of $9,160,197.57, plus interest and default interest;

(viii)    on the eighth cause of action, against Taxi Club in the amount of $1,489,738.27, plus interest and default interest;

(ix)    on the ninth cause of action, against the Vehicle Loan Borrowers, jointly and severally, in the amount of $984,099.82 plus interest and default interest;

(x)    on the tenth cause of action, against defendant Evgeny Freidman in the amount of $31,540,946.63, plus interest and default interest;

(xi)    on the eleventh cause of action, against the Medallion Loan Borrowers, jointly and severally, for $1,489,738.27, plus interest and default interest;

(xii)   on the twelfth cause of action, against the $21 Million Medallion Loan Borrowers, the $10 Million Medallion Loan Borrowers, Taxi Club, the Vehicle Loan Borrowers and Freidman, jointly and severally, for collection expenses, including attorneys' fees, costs and disbursements, in an amount to be determined; and

(xiii)  for costs, disbursements and such further and other relief as the Court deems just and proper.

Dated:   New York, New York
         March 5, 2015

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
     Nathan Schwed
     Tracee E. Davis
     Bruce S. Goodman
     Attorneys for Plaintiff
     1211 Avenue of the Americas
     New York, New York 10036
     (212) 223-0400

## VERIFICATION

STATE OF NEW YORK,
COUNTY OF QUEENS.

        CHARLES NIGRO, being duly sworn, says that he is a Director of

Citibank, N.A., plaintiff named in the foregoing complaint; that he has read the

foregoing complaint and that the complaint is true to his own knowledge, except as to

those matters therein stated to be alleged upon information and belief, and that as to

those matters, he believes them to be true.

 

 

CHARLES NIGRO

Sworn to before me this
_5_ day of March, 2015

Notary Public

MICHAEL KEYMAN JUHN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01JU6217862
Qualified in Queens County
My Commission Expires February 22, 2018

794695v1